# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

24-1102
CRIMINAL

---

## UNITED STATES OF AMERICA,
Appellee,

v.

## DAVID MICHAEL WOODS,
Appellant.

---

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE*
*SOUTHERN DISTRICT OF IOWA*
*HONORABLE STEPHANIE M. ROSE, CHIEF U.S. DISTRICT COURT JUDGE*

---

## BRIEF OF APPELLEE

---

**Richard D. Westphal**
*United States Attorney*

**Kyle P. Hanson**
*Assistant United States Attorney*

Neal Smith Federal Building
210 Walnut Street, Suite 455
Des Moines, Iowa 50309
Tel: (515) 473-9300

Attorneys for Appellee

# SUMMARY OF THE CASE

David Woods appeals his convictions and sentences for child pornography offenses. Woods knowingly and voluntarily waived his right to counsel following a detailed *Faretta* colloquy, and the record confirms he understood the perils of self-representation. Next, the district court provided the model instruction defining reasonable doubt, and it did not plainly err by declining Woods's belated request to add vague and untested language. Likewise, the district court did not plainly err by warning Woods and counsel for a potential defense witness about the possible consequences of giving a false alibi. And because Woods has not proven any trial error, his claim of cumulative error also fails. Finally, the sentencing court did not commit plain error by expecting Woods to pay a $2500 special assessment in small installments over his lengthy incarceration. His convictions and sentences should be affirmed.

# STATEMENT REGARDING ORAL ARGUMENT

This case has been screened for oral argument. The United States suggests fifteen minutes per party would be adequate for a full discussion of the issues.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE ........................................................................i

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF CONTENTS ......................................................................ii

TABLE OF AUTHORITIES ...............................................................iv

STATEMENT OF THE ISSUES..............................................................1

STATEMENT OF THE CASE ................................................................2

SUMMARY OF THE ARGUMENT .......................................................16

ARGUMENT ....................................................................................18

I.    Woods validly waived his right to counsel because he understood the perils of self-representation.
      A.    Standard of review ................................................................18
      B.    Argument...............................................................................21

II.   Woods fails to prove plain error because the district court provided the model instruction on reasonable doubt and reasonably declined a belated attempt to modify that instruction.
      A.    Standard of review ................................................................33
      B.    Argument...............................................................................33

III.  Woods fails to show plain error in the district court's non-threatening reminder of the possible consequences if he testified falsely.
      A.    Standard of review ................................................................39
      B.    Argument...............................................................................40

Appellate Case: 24-1102    Page: 3    Date Filed: 07/31/2024 Entry ID: 5419285

IV.   Woods fails to establish plain error in the district court's steps to ensure the victim understood the possible consequences of giving a false alibi.
     A.    Standard of review ................................................................ 48
     B.    Argument ............................................................................... 48

V.   The absence of any trial error precludes Woods's cumulative error argument ............................................................................................ 54

VI.   Woods fails to demonstrate plain error because he has the ability to pay the criminal assessment by making small payments throughout his lengthy incarceration.
     A.    Standard of review ................................................................ 55
     B.    Argument ............................................................................... 55

CONCLUSION ............................................................................................ 63

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................... 64

CERTIFICATE OF SUBMISSION AND VIRUS SCAN ......................... 65

CERTIFICATE OF SERVICE ................................................................... 66

Appellate Case: 24-1102    Page: 4    Date Filed: 07/31/2024   Entry ID: 5419285

# TABLE OF AUTHORITIES

**CASES:**

*Becht v. United States*, 403 F.3d 541 (8th Cir. 2005)..............................37

*Caldwell v. State*, 886 N.W.2d 491 (Minn. 2016) ...................................50

*Close v. United States*, 679 F.3d 714 (8th Cir. 2012) .............................38

*Driggers v. Cruz*, No. 3:11-CV-2310-D-BK, 2012 WL 2510847
(N.D. Tex. June 1, 2012)............................................................62

*Faretta v. California*, 422 U.S. 806 (1975) .......................................22, 29

*Iowa v. Tovar*, 541 U.S. 77 (2004)................................................22

*Jackson v. Virginia*, 443 U.S. 307 (1979) .........................................35

*McKaskle v. Wiggins*, 465 U.S. 168 (1984) ..............................................27

*Meyer v. Sargent*, 854 F.2d 1110 (8th Cir. 1988)...................................23

*Nix v. Whiteside*, 475 U.S. 157 (1986)..............................................46

*Scott v. Wilson*, No. 3:16CV804, 2018 WL 1144586
(E.D. Va. Mar. 2, 2018)............................................................61

*United States v. Anderson*, 783 F.3d 727 (8th Cir. 2015) .......................54

*United States v. Arthur*, 949 F.2d 211 (6th Cir. 1991).....................51, 52

*United States v. Ball*, No. 23-3461, 2024 WL 3311412
 (8th Cir. July 5, 2024)..........................................................57, 60

*United States v. Barthman*, 983 F.3d 318 (8th Cir. 2020).....................58

*United States v. Bernard*, 708 F.3d 583 (4th Cir. 2013) ..................19, 20

iv

*United States v. Burney*, 75 F.3d 442 (8th Cir. 1996) ............................. 25

*United States v. Coleman*, 961 F.3d 1024 (8th Cir. 2020) ...................... 37

*United States v. Davis*, 974 F.2d 182 (D.C. Cir. 1992)............................ 41

*United States v. Easterling*, 811 F. App'x 306 (6th Cir. 2020) .............. 60

*United States v. Erskine*, 355 F.3d 1161 (9th Cir. 2004) ........................ 19

*United States v. Garrett*, 42 F.4th 114 (2d Cir. 2022)............................. 19

*United States v. Hakim*, 30 F.4th 1310 (11th Cir. 2022) ........................ 26

*United States v. Hansen*, 929 F.3d 1238 (10th Cir. 2019) ...................... 19

*United States v. Herrera-Martinez*, 985 F.2d 298 (6th Cir. 1993).......... 19

*United States v. Hyde*, No. 22-10332, 2024 WL 726909
 (11th Cir. Feb. 22, 2024) ........................................................................ 19

*United States v. Johnson*, 456 F. Supp. 2d 1016 (N.D. Iowa 2006)........ 30

*United States v. Johnson*, 65 F.4th 932 (7th Cir. 2023) ......................... 47

*United States v. Keiser*, 578 F.3d 897 (8th Cir. 2009)............................ 27

*United States v. Kelley*, 774 F.3d 434 (8th Cir. 2014) ........................18-19

*United States v. Kelley*, 861 F.3d 790, 800 n.5 (8th Cir. 2017).............. 58

*United States v. Kidd*, 23 F.4th 781 (8th Cir. 2022) ............................... 61

*United States v. Louper-Morris*, 672 F.3d 539 (8th Cir. 2012) .............. 54

*United States v. Luscombe*, 950 F.3d 1021 (8th Cir. 2020).............. 19, 20

*United States v. Marin*, 31 F.4th 1049 (8th Cir. 2022) ..................... 46, 53

v

*United States v. Modena*, 302 F.3d 626 (6th Cir. 2002) ........................ 19

*United States v. Ohlmeier*, 25 F.4th 571 (8th Cir. 2022) ....................... 55

*United States v. Pirani*, 406 F.3d 543 (8th Cir. 2005) ............... 39, 40, 48

*United States v. Poitra*, 648 F.3d 884 (8th Cir. 2011) ............................ 33

*United States v. Powell*, 444 F. App'x 517 (3d Cir. 2011) ...................... 54

*United States v. Rhodes*, 828 F. App'x 342 (8th Cir. 2020) .................... 58

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990) ....................... 54

*United States v. Ricardo*, 472 F.3d 277 (5th Cir. 2006) ......................... 47

*United States v. Schaefer*, 13 F.4th 875 (9th Cir. 2021) ........................ 26

*United States v. Skorniak*, 59 F.3d 750 (8th Cir. 1995) ......................... 32

*United States v. Smith*, 433 F. App'x 847 (11th Cir. 2011) ................... 46

*United States v. Stanley*, 739 F.3d 633 (11th Cir. 2014) ....................... 20

*United States v. Stanley*, 891 F.3d 735 (8th Cir. 2018) ......................... 23

*United States v. True*, 179 F.3d 1087 (8th Cir. 1999) .......... 42, 45, 50, 53

*United States v. Turner*, 644 F.3d 713 (8th Cir. 2011) .......................... 22

*United States v. Urkevich*, 408 F.3d 1031 (8th Cir. 2005) ..................... 37

*United States v. Watkins*, 66 F.4th 1179 (8th Cir. 2023) ....................... 36

*United States v. Webster*, 84 F.3d 1056 (8th Cir. 1996) ......................... 27

*United States v. Wesley*, 96 F.4th 1045 (8th Cir. 2024) .................... 57, 58

*United States v. West*, 28 F.3d 748 (8th Cir. 1994) ................................ 37

Appellate Case: 24-1102    Page: 7    Date Filed: 07/31/2024 Entry ID: 5419285

*United States v. Wright*, 540 F.3d 833 (8th Cir. 2008) ..................... 57, 59

*Victor v. Nebraska*, 511 U.S. 1 (1994) ........................................................ 36

*Webb v. Texas*, 409 U.S. 95 (1972) .......................................................... 50


## STATUTES:

18 U.S.C. § 2259A(a) .................................................................................. 56

18 U.S.C. § 2259A(a)(3) ............................................................................. 56

18 U.S.C. § 2259A(c) .................................................................................. 56

18 U.S.C. § 2259B ...................................................................................... 56

18 U.S.C. § 3509(m) ................................................................................... 30

18 U.S.C. § 3572(a)(1) ................................................................................ 56


## OTHER AUTHORITIES:

8th Cir. Model Criminal Jury Instr. 3.11 (2023) .................................... 34

28 C.F.R. § 545.11 ....................................................................................... 61

28 C.F.R. § 545.11(b) ............................................................................ 61, 62

Fed. Judicial Ctr., *Benchbook for U.S. District Court Judges* § 1.02(C)
  (6th ed. 2013) ......................................................................................... 25

Justice for Victims of Trafficking Act, 18 U.S.C. § 3014(a) ................... 56

Appellate Case: 24-1102     Page: 8     Date Filed: 07/31/2024 Entry ID: 5419285

# STATEMENT OF THE ISSUES

**I.  Whether the defendant validly waived his right to counsel when he understood the perils of self-representation.**
1. *Faretta v. California*, 422 U.S. 806 (1975)
2. *United States v. Turner*, 644 F.3d 713 (8th Cir. 2011)
3. *United States v. Stanley*, 891 F.3d 735 (8th Cir. 2018)

**II.  Whether the defendant fails to prove plain error when the district court provided the model instruction on reasonable doubt and reasonably declined a belated attempt to modify that instruction.**
1. *Victor v. Nebraska*, 511 U.S. 1 (1994)
2. *United States v. Watkins*, 66 F.4th 1179 (8th Cir. 2023)
3. *United States v. West*, 28 F.3d 748 (8th Cir. 1994)

**III.  Whether the defendant fails to show plain error in the district court's non-threatening reminder of the possible consequences if he testified falsely.**
1. *United States v. True*, 179 F.3d 1087 (8th Cir. 1999)
2. *United States v. Davis*, 974 F.2d 182 (D.C. Cir. 1992)
3. *United States v. Smith*, 433 F. App'x 847 (11th Cir. 2011)

**IV.  Whether the defendant fails to establish plain error in the district court's steps to ensure the victim understood the possible consequences of giving a false alibi.**
1. *United States v. True*, 179 F.3d 1087 (8th Cir. 1999)

**V.  Whether the absence of any trial error precludes the defendant's cumulative error argument.**
1. *United States v. Powell*, 444 F. App'x 517 (3d Cir. 2011)
2. *United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990)

1

**VI. Whether the defendant fails to demonstrate plain error when he has the ability to pay the criminal assessment by making small payments throughout his lengthy incarceration.**

1. *United States v. Wesley*, 96 F.4th 1045 (8th Cir. 2024)
2. *United States v. Kelley*, 774 F.3d 434 (8th Cir. 2014)
3. *United States v. Ball*, No. 23-3461, 2024 WL 3311412 (8th Cir. July 5, 2024)
4. *United States v. Easterling*, 811 F. App'x 306 (6th Cir. 2020)

## STATEMENT OF THE CASE

"Now u can have boy butt for ur cock whenever u want. And we will have 2 soon enough," Woods said, offering both his adopted son and his future foster son to a pedophile known as "thechildebeast" on Snapchat. (R. Doc. 198, p. 39 (Gov't Ex. 84).)

Woods knew Riley Childers—a/k/a "thechildebeast"—through the Grindr app. (Trial Tr. Vol. II, pp. 237-38.) They also communicated via Snapchat, with Woods using the handle "dwoods4226." (Trial Tr. Vol. II, p. 237.) Their discussions revolved around engaging in sex acts with Woods's children. (Trial Tr. Vol. II, p. 238.)

Woods sent Childers naked photos of MV2, who was fifteen years old. Trial Tr. Vol. I, p. 125, Trial Tr. Vol. II, p. 239.) Snapchat messages between the two discussed MV2 and his body parts. (R. Doc. 198, pp. 37-44 (Gov't Ex. 83-84, 86-89).) Woods also shared that a second boy—MV1—

2

would soon be joining his household, and Childers said he would "be the first one to use the new boy." (R. Doc. 198, p. 39 (Gov't Ex. 84).) But Woods said he also had "an aggressive friend in MN" named Kyle who "really wants little [MV1] and take him forcefully." (R. Doc. 198, p. 46 (Gov't Ex. 91).)

Kyle Maguire, who lived in Minnesota, communicated with Woods over Facebook and Snapchat. (Trial Tr. Vol. II, pp. 246-47.) Woods sent videos of himself and another man having intercourse with the younger boy, MV1. (Trial Tr. Vol. II, pp. 247.) Woods sent other videos of MV1 inviting Maguire to visit so the boy could perform oral sex on Maguire. (*Id.*) On a different occasion, Woods video-chatted with Maguire while having MV1 perform oral sex on him. (Trial Tr. Vol. II, p. 248.)

Another man—co-defendant Jason Heider—met Woods on Grindr, and they began communicating over Snapchat. (Trial Tr. Vol. II, pp. 258-59.) Woods shared that he was having sex with MV2 and offering the boy to others. (Trial Tr. Vol. II, p. 259.) Woods sent explicit photos and videos of MV1 and MV2, including videos of each boy performing oral sex on Woods. (Trial Tr. Vol. II, p. 262.) Later, they discussed Heider having sex with twelve-year-old MV1. (Trial Tr. Vol. II, p. 260.) Woods made videos

3

of the boy saying he wanted Heider to "fuck him." (Trial Tr. Vol. II, p. 262; R. Doc. 198, pp. 68, 74, 77 (Gov't Ex. 102B, 104B, 105B).)

Heider visited Woods's Davenport home on MLK Day in 2021. (Trial Tr. Vol. II, pp. 260-61.) Only Woods and MV1 were home. (Trial Tr. Vol. II, p. 261.) Woods took photos of Heider using his penis to penetrate MV1's anus. (Trial Tr. Vol. II, p. 261.)

In February 2021, police searched Woods's home on East Pleasant Street in Davenport.[1] (Trial Tr. Vol. I, pp. 107-08.) They returned with a second warrant in May after receiving a tip from police in Minnesota. (Trial Tr. Vol. I, pp. 114-16.) They learned he had moved in with his parents, so they found him at his parents' home and seized his cell phone. (Trial Tr. Vol. I, pp. 83-84, 116-17.)

When a photo or video is created or viewed on a cell phone, it automatically makes a smaller version of the photo called a thumbnail. (Trial Tr. Vol. I, pp. 91-93.) Thumbnails are stored in the phone's cache and remain on the phone even if the user deletes the photo or video.

---

[1] MV1 disclosed the sexual abuse during a therapy session, which led state authorities to remove the children from Woods's home and charge Woods with sexual abuse. (PSR pp. 5-6, ¶¶ 7-9.)

4

(Trial Tr. Vol. I, pp. 92-93.) A photo taken in a third-party app like Snapchat might not be saved to the phone but could leave a thumbnail. (Trial Tr. Vol. I, pp. 95-96.) The "created" date associated with a photo file refers to when the file was created on that device, not necessarily when the photo was first captured. (Trial Tr. Vol. I, pp. 94-95.)

Woods's phone contained many photos and thumbnails of MV1 and MV2 in their underwear, nude, or displaying their genitals. (*See generally* Trial Tr. Vol. I, pp. 118-141.)[2] The backgrounds visible in many photos showed they were taken in Woods's bedroom, shower, or living room. (Trial Tr. Vol. I, pp. 120, 126-28, 130-33, 135, 137, 139.) Some photos included the photographer's finger or foot. (Trial Tr. Vol. I, pp. 125, 129, 131, 133, 134.) At least one photo showed Woods's dog. (Trial Tr. Vol. I, p. 129.) Woods appeared in some photos, including one of him kissing MV2. (Trial Tr. Vol. I, pp. 131, 136-37, 158.)

---

[2] The jury viewed government's exhibits 32 to 81A, which are not e-filed because they contain child sexual abuse material. Descriptions of the photos appear in the PSR, which the sentencing court found accurately summarized the trial exhibits. (PSR pp. 9-12, ¶ 26; Sent. Tr. 7.) Contraband exhibits are available upon the Court's request.

Appellate Case: 24-1102    Page: 13    Date Filed: 07/31/2024 Entry ID: 5419285

A series of three photos from Woods's phone—created from 11:33 to 11:35 a.m. on January 18, 2021—depicted a man anally penetrating MV1 on Woods's living room couch. (Trial Tr. Vol. I, p. 140.) The man was wearing a button-up shirt and tie, a wedding ring, an Apple watch, and black and grey socks. (*Id.*) The person taking the photo wore a white sock with a yellow tip. (*Id.*) Woods was wearing "that exact same sock" when police executed the first search warrant in February 2021. (Trial Tr. Vol. I, pp. 140-41.) And during a subsequent search warrant, police found the same couch and couch pad stored in Woods's parents' garage. (Trial Tr. Vol. I, pp. 141-43.)

Data on Woods's phone showed it used the "dwoods4226" account on Snapchat. (Trial Tr. Vol. I, pp. 150-51.) Police recovered some messages between Woods and Childers from August 2020. (Trial Tr. Vol. I, pp. 151-55; R. Doc. 198, pp. 37-39, 41-49 (Gov't Ex. 83-84, 86-93).) The dates and times of the Snapchat messages corresponded with the dates and times of photos or thumbnails from Woods's phone. (Trial Tr. Vol. I, pp. 155-67.) For example, on days when Woods discussed sending naked photos of MV2, his phone had nude thumbnail photos of MV2 from the same dates. (Trial Tr. Vol. I, pp. 160-62; R. Doc. 198, pp. 41-44

6

(Gov't Ex. 86-89).) When Woods sent a message about providing an "[u]p close view for u," his phone had a corresponding close-up photo of MV2's genitals from the same date. (Trial Tr. Vol. I, pp. 164-65; R. Doc. 198, p. 47 (Gov't Ex. 92).) Or when they discussed MV1's "[c]ute butt," Woods's phone had a photo of MV1's "butt" from the same date. (Trial Tr. Vol. I, pp. 165-67; R. Doc. 198, p. 48 (Gov't Ex. 93).)

Some of Woods's chats mentioned "Jason," and his phone included contact information for Jason Heider. (Trial Tr. Vol. I, p. 170.) Police had not yet identified the man in the photos sexually assaulting MV1, so they invited Heider for an interview. (Trial Tr. Vol. I, pp. 170-71.) During that interview, Detective Evan Obert noticed Heider was wearing dress clothes, a wedding ring, an Apple watch, and black socks—all consistent with the man from the sexual assault images. (Trial Tr. Vol. I, p. 171.)

Heider's phone had nude images of MV1 and MV2 taken inside Woods's house. (Trial Tr. Vol. I, pp. 183-87.)[3] Heider's phone also had several videos of MV1—some clothed and some stripped to his underwear—with Woods's voice coaching MV1 to speak. (Trial Tr. Vol. I,

---

[3] The jury viewed government's exhibits 108 to 117, which are described in the PSR. (PSR pp. 19-20, ¶ 58(c).)

7

pp. 173-83.)[4] At least one video showed MV1 performing oral sex on Woods and then Woods cuing MV1 to say, "Hi Jason. I can't wait [for] you to fuck me." (R. Doc. 198, pp. 74, 77 (Gov't Ex. 104B, 105B); PSR p. 19, ¶ 58(a)(5).) The last video—complete with a reflection of Woods recording it—depicted MV1 talking about seeing Heider "tomorrow." (Trial Tr. Vol. I, pp. 181-82; R. Doc. 198, p. 83 (Gov't Ex. 107B).) Its timestamp was January 18, 2021, at 6:46 a.m., which reflected the time Heider would have accessed the video on Snapchat and saved it to his phone. (Trial Tr. Vol. I, pp. 96, 182.)

Messages on Woods's phone showed he asked his mother to watch MV2 for a few hours on January 18. (Trial Tr. Vol. II, pp. 284-87; R. Doc. 198, p. 159 (Gov't Ex. 129).) Meanwhile, location data from Heider's phone indicated he was within a two-block radius of Woods's home at 11:30 a.m. on January 18, 2021. (Trial Tr. Vol. I, pp. 199-200.) That time aligned with the photos of MV1 being sexually assaulted on Woods's couch. (Trial Tr. Vol. I, p. 140.)

_____

[4] The jury viewed government's exhibits 100 to 107, which are described in the PSR. (PSR pp. 18-19, ¶ 58(a).)

Appellate Case: 24-1102     Page: 16     Date Filed: 07/31/2024 Entry ID: 5419285

**Charges and waiver of counsel**

A grand jury charged Woods with production of child pornography concerning MV1, in violation of 18 U.S.C. § 2251(a) and 2251(e); production of child pornography concerning MV2, in violation of 18 U.S.C. § 2251(a) and 2251(e); distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and 2252(b)(1); and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and 2252(b)(2). (R. Doc. 2.)

Woods retained an attorney, but months later he sought new counsel by alleging a breakdown of the attorney-client relationship. (R. Doc. 9, 53.) Attorney Terence McAtee was appointed and represented Woods in an unsuccessful motion to suppress. (R. Doc. 60, 81.)

Then, Woods filed a motion to remove counsel and represent himself. (R. Doc. 89.) The district court (Hon. Stephen P. Jackson, Magistrate Judge) held a hearing on the motion. (*See generally* 5/10/2023 Faretta Tr.)

The court made sure Woods knew the elements of each charge. (Faretta Tr. 5-8.) Next, it advised Woods of the minimum and maximum sentences for each count. (Faretta Tr. 8-11.) It explained the sentencing

9

judge would have the discretion to run the sentences concurrently or consecutively, and Woods said he understood the difference. (Faretta Tr. 11.) To illustrate the concept of consecutive sentences, the court added the minimum terms for each count. (Faretta Tr. 11.) The court also explained forfeiture, restitution, and sex offender registration. (Faretta Tr. 11-12.) Woods affirmed that he understood the nature of the charges and the possible penalties, and he had no questions. (Faretta Tr. 12.)

Next, the court cautioned that self-representation "is not considered a good idea" because of "many dangers and disadvantages." (Faretta Tr. 13.) It explained that counsel would be better suited to respond to unexpected events, to make persuasive arguments, to draft jury instructions, and to develop strategies and tactics. (Faretta Tr. 13-14.) When Woods said he was unfamiliar with the Rules of Evidence and Rules of Criminal Procedure, the court warned that he would need to follow the rules and would be "better off being defended by a trained lawyer." (Faretta Tr. 16-17.) When Woods asked if he "would still have a backup counsel," the court clarified that attorney McAtee would serve as

10

standby counsel and explained the role of standby counsel. (Faretta Tr. 17-19.)

Additionally, the court explained that certain discovery materials could not leave the U.S. Attorney's Office, so Woods would not be able to review them. (Faretta Tr. 19.) Attorney McAtee explained his office would review the discovery and discuss it with Woods, and Woods said he understood that procedure. (Faretta Tr. 19-20.) The court clarified that the preexisting discovery order did not permit leaving any discovery with Woods, and Woods responded, "I don't believe that would be an issue." (Faretta Tr. 20-21.)

The court granted Woods's motion to represent himself and appointed attorney McAtee as standby counsel. (Faretta Tr. 27-28; R. Doc. 92.)

**Trial**

As trial approached, the marshals arranged for Woods to review discovery materials on a computer in a holding cell. (9/1/2023 Status Hrg. Tr. 3.) At the final pretrial conference, Woods seemed to agree that he had sufficient time to review discovery and confirmed that he would be ready for trial the following Monday. (9/21/2023 PTC Tr. 60-61.) Trial

11

commenced without Woods raising any complaints about being unprepared. (Trial Tr. Vol. I, pp. 9-14.)

After the government rested its case, Woods said he intended to call MV2 to testify that "we went downtown" on the day Heider assaulted MV1. (Trial Tr. Vol. II, p. 268.) Woods had previously expressed his intent to offer MV2 as a witness, leading the government to suggest appointing counsel to advise MV2 regarding "some issues about perjury." (9/21/2023 PTC Tr. 70-71.)

The district court (Hon. Stephanie M. Rose, Chief Judge) informed MV2's attorney of Woods's intent to call MV2 as an alibi witness despite evidence showing Woods was not with MV2 that day. (Trial Tr. Vol. II, pp. 268-69.) The court expressed concerns "that [MV2] may be put in a position of being asked to commit perjury on behalf of this defendant." (Trial Tr. Vol. II, p. 269.) It added that MV2 "probably has a Fifth Amendment privilege not to testify as the defendant has proposed" and that he would face "pretty difficult" cross examination if he took the stand. (*Id.*)

After that, Woods shared that his sister could provide the alibi by testifying that "she was with us down at the ice sculptures." (Trial Tr.

12

Vol. II, p. 271.) He said he needed more time to consider whether he would testify. (Trial Tr. Vol. II, p. 272.) The court explained his "right to testify or not to testify." (*Id.*) But it cautioned that if Woods testified falsely, he could be charged with perjury or get an obstruction enhancement at sentencing. (Trial Tr. Vol. II, pp. 272-73.) The court alluded to "the nature and extent of the evidence in this case" and expressed "some real concerns about you exposing yourself to additional charges or additional enhancements if you do choose to take the stand." (Trial Tr. Vol. II, p. 273.)

After breaking to consult with his attorney and his sister, Woods announced that he would not call MV2 or testify in his own defense. (Trial Tr. Vol. II, pp. 273-74.)

Woods's sister, Michelle, testified that on January 18, 2021, she, Woods, their parents, and "the kids" went to the riverfront together. (Trial Tr. Vol. II, p. 279.) She said they visited the chocolate factory, walked around the farmers market, looked at ice sculptures, and ate lunch in a restaurant. (Trial Tr. Vol. II, pp. 279-80.) She claimed Woods was not home from approximately 8 a.m. until around 2 or 3 p.m. (Trial Tr. Vol. II, p. 283.)

13

In rebuttal, the government offered copies of Woods's text messages showing that on the morning of January 18, 2021, he asked his mother to watch MV2 for a few hours. (Trial Tr. Vol. II, pp. 284-87; R. Doc. 198, p. 159 (Gov't Ex. 129).)

After the parties rested, the district court consulted the parties about the proposed jury instructions. (Trial Tr. Vol. II, pp. 290-91.) Woods had no objections. (Trial Tr. Vol. II, p. 292.)

During closing arguments, Woods contended the government "failed to prove their case by near certainty." (Trial Tr. Vol. II, p. 311.) The government objected, and the court responded that "the Government does not have to prove by a near certainty. The burden is proof beyond a reasonable doubt, as you've been instructed." (Trial Tr. Vol. II, pp. 311-12.) Woods did not object to this admonition. (Trial Tr. Vol. II, p. 312.)

The jury convicted Woods on all counts. (R. Doc. 182.)

**Sentencing**

At sentencing, the district court applied enhancements for the commission of sex acts against both boys and applied an adjustment for engaging in a pattern of prohibited sexual conduct. (Sent. Tr. 9-12.) It also imposed a two-level enhancement for obstruction of justice for

14

inducing his sister Michelle to provide a false alibi at trial. (Sent. Tr. 15-16.) The court referenced all the trial evidence that contradicted his sister's testimony as well as a post-trial jail phone call in which Michelle complained that Woods "did bad things" and "had me lie for you." (Sent. Tr. 16-17; R. Doc. 214-1 (Gov't Ex. 200A).)

The court calculated an offense level of 49 but noted that the guidelines "cap out" at level 43. (Sent. Tr. 18.) And the resulting advisory guideline range of life imprisonment reduced to the statutory maximum sentence of 1200 months. (Sent. Tr. 18-19.) After hearing from the parties and weighing the § 3553(a) factors, the court commented that Woods's conduct of sexually abusing the children and loaning them out to other pedophiles was "absolutely heartbreaking," "sickening," and "almost unimaginable." (Sent. Tr. 22-24.) It imposed consecutive sentences totaling 1200 months' imprisonment. (Sent. Tr. 25.)

Next, the court invited Woods to share any thoughts on the JVTA and AVAA assessments. (Sent. Tr. 27-28.) Woods responded that he had no assets, but said, "I understand that I would be getting a job when I go to jail." (Sent. Tr. 28.) The court determined that based on Woods's age, he would have at least twenty-five years to work in prison and earn

15

money to pay toward an assessment. (Sent. Tr. 28.) It found he could pay a $2500 AVAA assessment, which equated to $100 per year. (Sent. Tr. 28.)

Woods appeals.

## SUMMARY OF THE ARGUMENT

First, Woods knowingly and voluntarily waived his right to counsel. The court engaged him in a lengthy colloquy explaining the consequences he faced and the perils of self-representation. As to his specific complaints, the record confirms he understood the possibility of consecutive sentences, the role of standby counsel, and limits on discovery. Because Woods made his choice with "eyes open," he is not entitled to a new trial.

Second, Woods does not prove plain error in the court's instructions defining reasonable doubt. The jury received the model instruction on reasonable doubt, and Woods was not at liberty to modify that instruction during his closing argument. Also, he does not identify any court that has required defining reasonable doubt with the term "near certainty." The trial court did not plainly err by declining his belated additional

16

language, and the strong evidence precludes any reasonable probability of a different verdict.

Third, the district court did not plainly err by cautioning Woods against committing perjury. Its non-threatening reminder that false testimony "could" lead to a perjury charge or a sentencing enhancement did not badger him into giving up his right to testify. The ambiguous record does not prove that the court's warning—as opposed to other factors—caused him not to take the stand. And given the strength of the evidence disproving his potential alibi testimony, the warning did not prejudice his substantial rights.

Fourth, Woods does not demonstrate plain error in a similar warning aimed at a potential defense witness's attorney. Woods stated his intent to offer a dubious alibi from one of his victims. In response, the court took appropriate action by appointing an attorney to advise the victim about the consequences for lying under oath. The undeveloped record does not prove how much of the court's warning the attorney passed along to the victim or whether the attorney's advice caused Woods not to call the victim at trial. And because convincing evidence refuted the proposed alibi, Woods cannot show prejudice.

17

Fifth, Woods does not prove any error—let alone multiple errors—so his cumulative error argument likewise fails.

Finally, Woods shows no plain error relating to his ability to pay the AVAA assessment. He bore the burden to prove his inability to pay, and the record supports the district court's finding that he could afford to make small payments throughout the course of his lengthy incarceration. Imposition of the assessment did not contravene any plainly established law, so this Court should affirm.

## ARGUMENT

### I. Woods validly waived his right to counsel because he understood the perils of self-representation.

#### A. *Standard of review*

Woods proposes the preserved-error standard of review, but he did not preserve his *Faretta* complaints. A magistrate judge conducted the *Faretta* colloquy, found Woods "knowingly and voluntarily waived his right to counsel," and granted his motion to proceed pro se. (Faretta Tr. 18; R. Doc. 92.) "Yet [Woods] did not contest the magistrate judge's ruling by filing an objection in the district court, so he is precluded from assigning error to this ruling now on appeal." *United States v.*

18

*Kelley*, 774 F.3d 434, 438 (8th Cir. 2014) (citing R. Crim. P. 59(a)).

Although this Court "may excuse the default in the interests of justice," *id.* at 439, it should not do so in this case. Woods never complained about his choice to represent himself, even as he experienced the supposed pitfalls he now raises on appeal. Justice would not be served by granting him the windfall of a new trial for risks that did not bother him until after his self-representation experiment failed.

Because Woods did not object—either to the magistrate judge or to the district court at trial—review should be limited to plain error. This Court has previously recognized "it is unclear whether a defendant must formally object to the district court's decision to continue to allow him to represent himself at trial."[5] *United States v. Luscombe*, 950 F.3d 1021,

---

[5] The Fourth and Sixth Circuits have required proof of plain error from defendants who raised *Faretta* challenges for the first time on appeal. *United States v. Bernard*, 708 F.3d 583, 588 (4th Cir. 2013); *United States v. Modena*, 302 F.3d 626, 630 (6th Cir. 2002); *United States v. Herrera-Martinez*, 985 F.2d 298, 301 (6th Cir. 1993). *But See United States v. Erskine*, 355 F.3d 1161, 1166 (9th Cir. 2004) (rejecting plain error); *United States v. Hansen*, 929 F.3d 1238, 1248 (10th Cir. 2019). Other circuits, like this Court, have recognized the dispute but declined to take sides because the defendants' claims failed under a de novo review. *United States v. Hyde*, No. 22-10332, 2024 WL 726909, at *2 (11th Cir. Feb. 22, 2024) (unpublished); *United States v. Garrett*, 42 F.4th 114, 118 n.1 (2d Cir. 2022).

19

1027 (8th Cir. 2020) (citations omitted). The Court chose not to address the issue because it could affirm under the "ordinary de novo" standard. *Id.*

The better rule would require preservation of a *Faretta* challenge to receive de novo review, especially when the defendant was still represented by counsel at the waiver hearing. *See Bernard*, 708 F.3d at 588 n.7 (noting "defense counsel continued as Bernard's counsel of record until the district court granted the defendant's request to represent himself and appoint defense counsel as standby counsel" and concluding, "at a minimum, [counsel's] failure to preserve the claim of invalid waiver warrants plain error review"); *Stanley*, 739 F.3d at 645 (finding "plain error review may be appropriate, especially here because [counsel] represented Harris at the sentencing hearing, where he easily could have challenged Harris's previous waiver before the district court").

---

The Court is not bound to apply a de novo review under the cases Woods cites. (Br. 25.) Those cases represent "the mine run of cases [that] apply de novo review without discussing whether a defendant formally objected at trial." *United States v. Stanley*, 739 F.3d 633, 644 (11th Cir. 2014). And such cases that did not confront an error-preservation challenge offer little insight on which cases merit de novo review or which should require the defendant to demonstrate plain error.

20

Woods's counsel brought the self-representation request to the district court's attention and participated in the waiver hearing (R. Doc. 89; *see generally* Faretta Tr.), so there is nothing unfair about expecting counsel to object to an inadequate *Faretta* colloquy. And aside from counsel's failure to object, Woods himself never complained or sought reappointment of counsel when he encountered the supposed hardships he raises for the first time on appeal. Simply put, applying de novo review and awarding an automatic new trial is not appropriate for a defendant like Woods who cannot demonstrate a reasonable probability that a more thorough *Faretta* colloquy would have caused him to insist on accepting counsel.

## B. *Argument*

The district court did not err—plainly or otherwise—by accepting Woods's waiver of counsel. The record shows he understood the dangers and disadvantages of self-representation, including the maximum punishment he faced, standby counsel's limited role, and limitations on discovery. Because Woods proceeded with eyes wide open, this Court should not grant him a new trial.

Appellate Case: 24-1102    Page: 29    Date Filed: 07/31/2024 Entry ID: 5419285

The Sixth Amendment's right to counsel "necessarily implies the right of self-representation." *Faretta v. California*, 422 U.S. 806, 832 (1975). By demanding self-representation, the defendant "relinquishes . . . many of the traditional benefits associated with the right to counsel." *Id.* at 835. "[I]n order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits." *Id.* "[A] defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation." *Id.* But "he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.*

The *Faretta* warning need not follow any "prescribed [] formula or script." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004); *see also United States v. Turner*, 644 F.3d 713, 722 (8th Cir. 2011) ("[N]either the Supreme Court nor this court has ever adopted a list of essential points that must be conveyed to a defendant in order for a waiver of counsel to be deemed knowing and voluntary."). "The adequacy of the waiver depends on the particular facts and circumstances of each case, including the background, experience, and conduct of the accused." *Turner*, 644 F.3d at

22

721. "[A] relatively short and simple colloquy" will do. *Meyer v. Sargent*, 854 F.2d 1110, 1115 (8th Cir. 1988).

And even if the court's colloquy does not adequately warn the defendant, the waiver of counsel will be upheld when "the record shows . . . that, under all the circumstances, he knew and understood the dangers and disadvantages of self-representation." *United States v. Stanley*, 891 F.3d 735, 738 (8th Cir. 2018) (quoting *United States v. Tschacher*, 687 F.3d 923, 932 (8th Cir. 2012)); *see also Meyer*, 854 F.2d at 1115 (holding "that a specific on the record warning of the dangers and disadvantages of self-representation is not an absolute necessity in every case for a valid waiver of counsel").

Woods received a lengthy and detailed warning about the dangers and disadvantages of self-representation. The court ensured he knew the elements and potential sentences for his charges. (Faretta Tr. 5-12.). It warned that self-representation "is not considered a good idea" and "that the use of counsel is a much better alternative than self-representation," explaining the many ways counsel was better suited to represent him. (Faretta Tr. 13-17.) Woods did not equivocate when confirming that he

23

still wished to represent himself (Faretta Tr. 17-18), and his newfound complaints do not undermine his knowing and voluntary waiver.

### 1. Woods understood the possibility of consecutive sentences.

The record does not support Woods's claimed misunderstanding of consecutive sentencing. The court advised him of the penalties for his charges, including the minimum and maximum terms of imprisonment for each count. (Faretta Tr. 8-11.) It then explained that "if you're convicted of more than one count," then the sentencing judge "can order your sentences to run concurrently or consecutively." (Faretta Tr. 11.) Woods affirmed that he "kn[e]w the difference between those types of sentences." (Faretta Tr. 11.) The court then explained that "consecutive sentences run one after the other," and it illustrated that concept using the mandatory minimums as an example: "you have a mandatory minimum of 15 years on Count 1, 15 years on Count 2, and five years on Count 3. So you could face a minimum of 35 years in prison if those counts are run consecutive to each other." (Faretta Tr. 11.) Woods again agreed he understood. (Faretta Tr. 11.)

24

Woods demands a more detailed warning than *Faretta* requires. He argues that in addition to calculating the minimum consecutive sentences, the court also had to explain that the maximum sentences would total 100 years if imposed consecutively. (Br. 26-27.) But he cites no case holding so. Rather, this Court's precedent suggests the opposite. *See United States v. Burney*, 75 F.3d 442, 445 (8th Cir. 1996) (in a guilty-plea challenge, finding the district court adequately warned of the maximum possible sentence and the possibility of consecutive sentences "by explicitly informing [the defendant] twice that the maximum term of imprisonment for *each* of the three counts was ten years"). If anything, Woods's colloquy—complete with one example calculation—exceeded the benchbook's suggested warning on consecutive sentences. *See* Fed. Judicial Ctr., *Benchbook for U.S. District Court Judges* § 1.02(C) (6th ed. 2013) (stating the judge should ask a question similar to: "Do you understand that if you are found guilty of more than one of these crimes, this court can order that the sentences be served consecutively, that is, one after another?").

Contrary to the cases Woods cites (Br. 27), his *Faretta* colloquy did not include affirmative misadvice about the maximum possible penalty,

25

such as telling him the maximum sentence was lower than required by law.[6] He received accurate warnings about the maximum sentences for each count, about the possibility of consecutive sentences, and that "consecutive sentences run one after the other." (Faretta Tr. 11.) That the court left him to do the math does not render his waiver invalid.

Despite any claimed shortcomings in Woods's *Faretta* colloquy, the record shows he understood the concept of consecutive sentencing. For one, he expressed no surprise when the court imposed consecutive sentences totaling 100 years' imprisonment. (*See generally* Sent. Tr.) But a more telling example of his understanding came during his closing argument. He highlighted how co-defendant Heider faced "up to 15 to 50 years" (Trial Tr. Vol. II, p. 310), with fifty years representing the sum of Heider's maximum possible sentences. Thus, Woods knew how to compute his own maximum consecutive sentences even if the court's warning were inadequate. *See United States v. Hakim*, 30 F.4th 1310,

---

[6] Even if the court had misstated the effect of consecutive sentencing, such defect would not foreclose a valid waiver of counsel. *See, e.g.*, *United States v. Schaefer*, 13 F.4th 875, 886-89 (9th Cir. 2021) (finding a valid *Faretta* waiver when the district court "warned only '*it is possible* that sentences could run consecutively to each other'" even though the relevant statutes *required* consecutive sentences).

26

1324 (11th Cir. 2022) ("The ultimate test is not the trial court's express advice, but rather the defendant's understanding, and giving correct advice to a defendant about possible punishments is 'the ideal method' of ensuring that he has that understanding. But a defendant may also obtain an awareness of the penal consequences of his decision from other sources." (quotations omitted)). Because Woods understood how to calculate the maximum punishment he faced, his first complaint fails.

### 2. Woods understood the role of standby counsel.

Without citing any authority, Woods alleges his *Faretta* colloquy left him without a complete understanding of "the limitations of standby counsel." (Br. 28.) Although the district court has discretion to appoint standby counsel, a defendant like Woods who elects self-representation "does not enjoy an absolute right to standby counsel." *United States v. Webster*, 84 F.3d 1056, 1063 (8th Cir. 1996); s*ee also McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) ("A defendant does not have a constitutional right to choreograph special appearances by counsel."). Woods had the right to either be represented by counsel or represent himself, so the court had no obligation to advise him of the perils of in-between options like standby counsel. *Cf. United States v. Keiser*, 578 F.3d 897, 904 (8th

27

Cir. 2009) ("Because Keiser had no absolute right to standby counsel, we hold that the court's failure to inform him of such a right did not negate the validity of Keiser's waiver of his right to counsel.").

Even if *Faretta* necessitated a warning about standby counsel's limited duties, the record showed Woods understood. The court advised him of standby counsel's role: "So standby counsel aids you if and when you request help, or can represent a person in the event that the termination of their right to self-representation is necessary." (Faretta Tr. 3.) Woods said he understood and that his attorney had explained the concept. (Faretta Tr. 3.) Later, when Woods referred to "backup counsel" as someone "if I had questions, I could ask questions and get guidance," the court corrected that "you would have standby counsel." (Faretta Tr. 17.) This record demonstrates that although Woods mistook what to call his assisting attorney, he understood standby counsel's limited role of answering his questions and providing guidance.

Woods's related complaints do not undermine the voluntariness of his waiver. First, he says he did not have copies of the court rules. (Br. 28.) But he knew before the *Faretta* hearing that "I don't have a copy of the rules" (Faretta Tr. 4), and he still chose to waive his right to

28

counsel. Next, Woods points out that he "struggled with basic evidentiary rules." (Br. 28.) But at the *Faretta* hearing, the court made clear: "I think it's unwise of you to try to represent yourself. You're not familiar with the law governing the case--this case, the rules of evidence, or the Rules of Criminal Procedure, and so I strongly urge you not to try to represent yourself, Mr. Woods." (Faretta Tr. 16-17.) Thus, Woods made his choice with full knowledge that he lacked copies of the rules and lacked the training or experience to apply those rules with the same competence as an attorney. *Faretta* requires no more. *See Faretta*, 422 U.S. at 835 (accepting that "a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation").

### 3. Woods understood limitations on discovery.

In his final complaint, Woods overlooks warnings about discovery that came during the *Faretta* hearing. He alleges he faced an "unknown limitation" on discovery because the court did not tell him about it "until *after* he had been granted the ability to proceed pro se." (Br. 28.) Yet the "after" in this case was just a few lines of transcript. (*See* Faretta Tr. 18 (permitting self-representation on line 15 and shifting to discovery on

29

line 22).) The ensuing discussion of the supposed discovery limitations was sufficiently contemporaneous with the *Faretta* colloquy, giving Woods ample opportunity to reverse his self-representation request if he desired.

The court's discussion of discovery sufficiently warned Woods of the limitations he faced if he continued with self-representation. It advised Woods that discovery materials containing child sexual abuse material could not leave the U.S. Attorney's Office[7], "so that will make it difficult or impossible for you to see some of that discovery." (Faretta Tr. 19.) Standby counsel then agreed that, like any other child pornography case, he would review the contraband material and discuss it with his client, but "[o]bviously we can't take it down to the jail." (Faretta Tr. 19.) Woods affirmed that he understood how standby counsel would facilitate the discovery process. (Faretta Tr. 19-20.) The prosecutor then clarified that the preexisting discovery stipulation prevented counsel from leaving

---

[7] *See* 18 U.S.C. § 3509(m) (mandating that child pornography "shall remain in the care, custody, and control of either the Government or the court"); *United States v. Johnson*, 456 F. Supp. 2d 1016, 1017 (N.D. Iowa 2006) (finding § 3509(m) does not violate a criminal defendant's right to a fair trial).

30

copies with Woods at the jail, "and if the Defendant wants personal copies of particular items, then we're going to have to have a further discussion about that." (Faretta Tr. 20; *see also* R. Doc. 20, ¶ 4.) Woods responded, "I don't believe that would be an issue." (Faretta Tr. 21.) He did not complain or request reappointment of counsel, showing his voluntary choice to proceed pro se.

The remainder of the record confirms the discovery procedures did not undermine Woods's voluntary decision to represent himself. At a subsequent status hearing, the prosecutor explained that the marshals had set up a holding cell with a computer where Woods could review discovery materials. (9/1/2023 Status Hrg. Tr. 2-3.) At the final pretrial conference, the prosecutor updated that Woods had been brought to the courthouse "on a nearly daily basis" to review discovery, and Woods agreed he would be ready to begin trial the following Monday. (9/21/2023 PTC Tr. 60-61.) Woods did not complain about this procedure or seek reappointment of counsel to access discovery.[8] Because he undertook

---

[8] To be clear, Woods did raise discovery disputes. But they centered on whether certain materials existed rather than the discovery procedure itself. For example, Woods believed Riley Childers had made a deal with authorities in Minnesota to testify against Woods, but the prosecutor

31

self-representation with knowledge of the discovery process and any potential limitations, his third complaint fails.

*　　*　　*

Woods waived his right to counsel with "eyes open." The court engaged him in a detailed colloquy warning him of the perils of self-representation, including the consecutive sentences he faced, his ignorance of court rules, and potential discovery limits. And the record does not hint at any reasonable probability that Woods would have decided against self-representation. As a result, this Court should affirm his convictions.

---

explained she had no knowledge or evidence of any such cooperation agreement. (9/1/2023 Status Hrg. Tr. 10-14.) *See, e.g.*, *United States v. Skorniak*, 59 F.3d 750, 756 (8th Cir. 1995) (explaining that "[w]hile *Brady* requires the Government to tender to the defense all exculpatory evidence in its possession, it establishes no obligation on the Government to *seek out* such evidence" (quotation omitted)).

**II. Woods fails to prove plain error because the district court provided the model instruction on reasonable doubt and reasonably declined a belated attempt to modify that instruction.**

### A. *Standard of review*

Woods challenges what he calls "[t]he district court's instruction" on reasonable doubt (Br. 29), but he did not object at trial. (Trial Tr. Vol. II, pp. 311-12.) "Where a party fails to timely object to an instruction at trial, [] we review only for plain error." *United States v. Poitra*, 648 F.3d 884, 887 (8th Cir. 2011) (citation omitted). "To obtain relief under a plain-error standard of review, the party seeking relief must show that there was an error, the error is clear or obvious under current law, the error affected the party's substantial rights, and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

### B. *Argument*

Woods was not entitled to instruct the jury on the law during closing arguments. With his agreement, the district court had already provided the model instruction defining reasonable doubt. Woods does not point to any court that has required the phrase "near certainty" to

33

appear in the jury instructions, so the trial court did not commit a clear or obvious error when it rejected his late-proposed addition. Finally, the overwhelming proof of guilt leaves no reasonable probability of a different result had the court modified the reasonable doubt instruction.

The district court adequately instructed the jury on the reasonable doubt standard. Both at the beginning of trial and before closing arguments, it read the Eighth Circuit's model instruction defining reasonable doubt:

> Reasonable doubt is doubt based upon reason and common sense, and not doubt based on speculation. A reasonable doubt may arise from careful and impartial consideration of all the evidence, or from a lack of evidence. Proof beyond a reasonable doubt is proof of such a convincing character that a reasonable person, after careful consideration, would not hesitate to rely and act upon that proof in life's most important decisions. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt.

(Trial Tr. Vol. I, p. 69, Trial Tr. Vol. II, p. 299; R. Doc. 179, p. 10; R. Doc. 187, p. 25.) *Accord* 8th Cir. Model Criminal Jury Instr. 3.11 (2023). Woods did not object to this definition or propose any additions. (Trial Tr. Vol. II, p. 292.)

34

Rather than follow the established protocol to craft the jury instructions, Woods attempted to introduce a new legal standard during his closing argument. He argued the government "failed to prove their case by near certainty," which prompted the prosecutor's objection. (Trial Tr. Vol. II, p. 311.) The court responded, "the Government does not have to prove by a near certainty. The burden is proof beyond a reasonable doubt, as you've been instructed." (Trial Tr. Vol. II, p. 312.) This response was not plainly erroneous. When Woods tried to supplement the reasonable-doubt definition by adding the "near certainty" language, he broke the rule that the court—not the parties—holds the duty to instruct the jury. Woods had already assented to the model instruction on reasonable doubt, so the court redirecting the jury to that definition was not clearly or obviously wrong.

Woods provides no case requiring "near certainty" to appear in the jury instructions. He seizes on the Supreme Court's description of the reasonable doubt standard as "impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused." *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). And he quotes a handful of circuit cases repeating this "near certitude" passage. (Br. 30-31.) But

35

none of those cases commanded trial courts to include the phrases "near certitude" or "near certainty" in their jury instructions. Rather, the Supreme Court has made clear, "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (citation omitted). While appellate courts may use the phrase "near certainty" as a shorthand method to quantify the burden, explaining the standard to lay jurors requires a more elaborate definition, such as that contained in model instruction 3.11. *See, e.g.*, *United States v. Watkins*, 66 F.4th 1179, 1187 (8th Cir. 2023) (collecting cases and approving model instruction 3.11).

Injecting the "near certainty" addition, especially at such a late stage in trial, risked confusing the jury. At the literal last minute, Woods sought to modify the agreed-to definition of reasonable doubt with language so lacking of an established meaning that it bordered on being unconstitutionally vague. *See Victor*, 511 U.S. at 21 (noting that the phrase "moral certainty" could misstate the reasonable doubt standard if the instruction "provide[s] insufficient context to lend meaning to the phrase"). The district court did not plainly err by rejecting Woods's

36

ambiguous language or by favoring the model instruction that has been refined through decades of litigation.

Even if Woods could show the court committed a clear and obvious error, he cannot show prejudice. "Plain-error review permits reversal only if the error 'was so prejudicial as to have affected substantial rights resulting in a miscarriage of justice.'" *United States v. Urkevich*, 408 F.3d 1031, 1036 (8th Cir. 2005) (quotation omitted). Woods tries to bypass the prejudice prong by alleging structural error. (Br. 32.) But this Court has never held that "an unpreserved structural error automatically satisfies the third prong of the plain-error test." *United States v. Coleman*, 961 F.3d 1024, 1029 (8th Cir. 2020) (quoting *United States v. Picardi*, 739 F.3d 1118, 1123 n.3 (8th Cir. 2014)).

Woods's case does not involve a structural error flowing from "a defective jury instruction on the reasonable-doubt standard of proof." *Becht v. United States*, 403 F.3d 541, 547 (8th Cir. 2005) (citing *Neder v. United States*, 527 U.S. 1, 8 (1999)). Rather than the dicta in *Becht*, Woods's case is more akin to *United States v. West*, 28 F.3d 748, 749, 751-52 (8th Cir. 1994), which found an instruction referring to "the preponderance of all evidence" did not create a structural error because

37

"the jury received a proper instruction defining the concept of reasonable doubt." Like *West*, Woods's jury received the approved, model instruction defining reasonable doubt. (R. Doc. 179, p. 10; R. Doc. 187, p. 25.) Although the court did not allow him to add the imprecise "near certainty" language, the jury instructions had already told the jury how to reach the "subjective state of near certitude" that the Constitution requires. These circumstances do not expose any reasonable likelihood that his jury applied a lower standard of proof.

Next, the overwhelming evidence leaves no reasonable probability of a different verdict. *See Close v. United States*, 679 F.3d 714, 721 (8th Cir. 2012) ("Only where the evidence raised a reasonable probability of a different verdict if the correct instruction was given have we upheld a claim of plain error." (citations omitted)). Three men testified that Woods sent them child pornography and invited them to sexually abuse his adopted children. (Trial Tr. Vol. II, pp. 237-39, 246-48, 258-62.) Woods's phone contained numerous pornographic photos and thumbnails of MV1 and MV2 taken in Woods's home, focusing on their genitals or depicting them engaged in sex acts. (Trial Tr. Vol. I, pp. 118-41; PSR p. 9-12, ¶ 26.) Some of those photos corresponded to Snapchat messages Woods

38

exchanged with one of the pedophiles. (Trial Tr. Vol. I, pp. 151-67; R. Doc. 198, pp. 37-39, 41-49 (Gov't Ex. 83-84, 86-93).) Woods's reflection even appeared in one of the videos of MV1 inviting co-defendant Heider to the January 18, 2021, sexual assault. (Trial Tr. Vol. I, pp. 181-82; R. Doc. 198, p. 83 (Gov't Ex. 107B).) Phone data placed Heider at Woods's home at the same time as the photos of MV1 being sexually assaulted on Woods's living room couch. (Trial Tr. Vol. I, pp. 140, 141-43, 199-200.) And earlier that same morning, Woods had cleared the house by asking his mother to watch MV2 (Trial Tr. Vol. II, pp. 284-87), leaving MV1 alone to be raped while Woods photographed. This evidence established the "near certainty" Woods belatedly proposed, so he does not deserve plain-error relief.

Woods fails to prove any prong of plain error, so this Court should affirm his convictions.

## III. Woods fails to show plain error in the district court's non-threatening reminder of the possible consequences if he testified falsely.

### A.    *Standard of review*

Woods admits he did not preserve error, so review is limited to plain error. *See United States v. Pirani*, 406 F.3d 543, 549 (8th Cir. 2005) ("An

39

error by the trial court, even one affecting a constitutional right, is forfeited—that is, not preserved for appeal—'by the failure to make timely assertion of the right.' . . . Errors not properly preserved are reviewed only for plain error." (quoting *United States v. Olano*, 507 U.S. 725, 731 (1993))). To establish plain error, the defendant must demonstrate "(1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* at 550 (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* The Court exercises this power "sparingly." *Id.* (citing *Jones v. United States*, 527 U.S. 373, 389 (1999)).

## B.   Argument

Woods shows no plain error in the district court's prudent warning against perjury. After seeing signs that he would offer a false alibi, the court reminded him of the possible consequences for lying under oath. This non-threatening admonition did not overwhelm Woods's free choice whether to take the stand, so the court committed no error and did not prejudice his substantial rights. His convictions should be affirmed.

40

Following the government resting its case, the district court addressed Woods's decision whether to testify. It reminded him:

> If you testify falsely or commit perjury, the Government could charge you with additional charges. In the event you were convicted, if I found that you had attempted to obstruct justice during your testimony, I could enhance your sentence for that.
>
> Obviously, my expectation is that you wouldn't testify falsely, but given the nature and extent of the evidence in this case, I have some real concerns about you exposing yourself to additional charges or additional enhancements if you do choose to take the stand.

(Trial Tr. Vol. II, pp. 272-73.) The court then suggested Woods discuss his options with standby counsel, reiterating, "obviously, this is your decision and your decision alone to make." (Trial Tr. Vol. II, p. 273.)

Woods thinks this admonition "went a step too far" (Br. 34), but he concedes that "the Sixth Amendment is not implicated every time a prosecutor or trial court offers advice regarding the penalties of perjury." *United States v. Davis*, 974 F.2d 182, 187 (D.C. Cir. 1992) (citation omitted). Such warnings "are warranted—even prudent" in some circumstances, and the line is not crossed without "deliberate and badgering threats designed to quash significant testimony." *Davis*, 974 F.2d at 187. The inquiry is "extremely fact specific," with factors

41

including "the manner in which the prosecutor or judge raises the issue, the language of the warnings, and the prosecutor's or judge's basis in the record for believing the witness might lie." *United States v. True*, 179 F.3d 1087, 1090 (8th Cir. 1999) (quoting *United States v. Vavages*, 151 F.3d 1185, 1190 (9th Cir. 1998)). Applying these three factors, Woods fails to demonstrate clear or obvious error in the district court's admonition.

First, the district court's admonition was not threatening or intimidating. Woods likens his case to *True* (Br. 34), but in that case the prosecutor said she "probably would" charge the potential witness and that the witness "risked not only a prosecution for perjury, but prosecution under [18 U.S.C.] § 1001 for making a false statement to a peace officer." *True*, 179 F.3d at 1088. Woods also invokes *Webb v. Texas*, 409 U.S. 95, 96 (1972), which condemned singling out a potential defense witness with threats that "the Court will personally see that your case goes to the grand jury and you will be indicted for perjury" and that the witness "likely would get convicted," resulting in "several years" stacked onto his sentence. (Br. 35.) Rather than threatening that Woods "probably would" or "will be" charged with perjury, the district court only warned that false testimony "could" lead to a perjury charge or "could"

42

result in a sentencing enhancement. (Trial Tr. Vol. II, pp. 272-73.) The court then softened its warning by reassuring that it did not expect that Woods would testify falsely. (Trial Tr. Vol. II, p. 273.) Even on the cold record, the court's expression of concern reflects a helpful tone rather than threats intended to suppress his right to testify.

Second, the wording of the court's admonition made clear that Woods retained the sole discretion to decide whether to testify. Woods represented himself, and he now admits he "struggled" to follow basic rules. (Br. 28.) The court saw him headed toward transgressing the basic rule against offering false evidence, so it expressed "real concerns" about the consequences that Woods either did not know or did not fully appreciate. But the court used language emphasizing that the ultimate decision "is your decision and your decision alone to make." (Trial Tr. Vol. II, p. 273.) Thus, the court's words of concern did not interfere with his right to testify.

Third, the court had a sufficient basis to believe Woods might lie. In his opening statement, he claimed that "my sons and I were not at home at the alleged time of the crime." (Trial Tr. Vol. I, p. 73.) But that alibi crumbled as trial progressed. The evidence showed Woods

43

communicated with at least three men about sexually abusing the boys, as corroborated by disturbing Snapchat messages with one of those pedophiles. (Trial Tr. Vol. II, pp. 237-39, 246-48, 258-62; R. Doc. 198, pp. 37-39, 41-49 (Gov't Ex. 83-84, 86-93).) Woods sent a video to Heider of MV1 performing oral sex, Woods's voice coached MV1 in provocative videos sent to Heider before the January 18 assault, and Woods's reflection was visible in the final video. (Trial Tr. Vol. I, pp. 173-83; PSR pp. 18-19, ¶ 58(a).) Woods's phone contained images of Heider anally penetrating MV1 on Woods's living room couch, at the same time Heider's phone showed him within a two-block radius around Woods's home. (Trial Tr. Vol. I, pp. 140, 141-43, 199-200; PSR p. 12, ¶ 26(b)(23).) Woods wore "the exact same sock" as the man photographing MV1's sexual assault. (Trial Tr. Vol. I, pp. 140-41.) Because all this evidence refuted Woods's proposed alibi, the court's warning addressed a reasonable concern that he might testify falsely.

Even more fundamentally, Woods does not prove that the court's admonition caused him not to testify. He contends the court's statements "ensured [he] would not testify on his own behalf." (Br. 35.) But even before the court gave its warning, Woods equivocated about whether he

44

still planned to testify, saying, "I wouldn't – I would need to think about that again." (Trial Tr. Vol. II, p. 272.) He had just explained that his sister would testify that "she was with us down at the ice sculptures, so she would be talking about us being down there together." (Trial Tr. Vol. II, p. 271.) The court gave Woods time to confer with his sister and to think about whether to testify, and then after a fifteen-minute break he announced his decision not to testify. (Trial Tr. Vol. II, pp. 273-74.) At best, this record is ambiguous about what factor—his sister's expected testimony or the court's admonition—influenced his decision. But the chain of events also suggests Woods may have chosen his own testimony was no longer needed because he had succeeded in persuading his sister to provide the false alibi.

Under these circumstances, Woods fails to demonstrate a clear or obvious error that prejudiced his substantial rights. The court expressed reasonable and non-coercive concerns of potential perjury, and the record does not prove the court's warning changed Woods's mind about testifying. *See True*, 179 F.3d at 1090 (finding no prejudice when "the record does not support the conclusion that the prosecutor's comments caused [the witness's] silence"). And given the strength of the evidence,

45

he fails to "demonstrate a reasonable probability that the outcome would have been different absent the alleged error." *United States v. Marin*, 31 F.4th 1049, 1055 (8th Cir. 2022) (quotation omitted).

Finally, the Court should reject Woods's structural error argument as a bridge too far. He admits "[i]t is an open question" whether interference with his right to testify constitutes structural error, and then "it is an unsettled question" whether structural error requires automatic reversal under plain-error analysis. (Br. 35, 37.) This is not the case to reach those issues. The court did not stop Woods from testifying; it only cautioned him not to testify falsely. *See Nix v. Whiteside*, 475 U.S. 157, 173 (1986) ("Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying *falsely*."). Such a warning does not affect the fundamental framework of the trial proceedings. Rather, courts recognize that statements alleged to have influenced a defendant's choice to testify are claims of typical trial error subject to the normal harmless- or plain-error tests. *See, e.g.*, *United States v. Smith*, 433 F. App'x 847, 851 (11th Cir. 2011) (unpublished) (declining to apply structural error and explaining, "It is not impossible, or all that difficult, to assess the effect of the claimed error on the outcome

46

of the trial. A defendant who was persuaded not to testify, or prevented from testifying, can establish the harm he suffered by proffering the testimony that he would have given." (citing *Palmer v. Hendricks*, 592 F.3d 386, 399 (3d Cir. 2010))); *United States v. Ricardo*, 472 F.3d 277, 286 (5th Cir. 2006) (applying plain-error review to a claim that the district court's warning about the obstruction enhancement suppressed the defendants' trial testimony); *United States v. Johnson*, 65 F.4th 932, 942 (7th Cir. 2023) (recognizing a violation of the defendant's right to testify "is subject to harmless-error review" (citing *Ortega v. O'Leary*, 843 F.2d 258, 262 (7th Cir. 1988))).

Woods fails to demonstrate plain error. The court's non-threatening warning of the consequences for perjury did not infringe his right to testify. And even if the court said too much, Woods does not prove that the admonition—rather than other factors—caused him to forgo testifying in his own defense. And the strength of the evidence eliminates any reasonable probability of a different verdict. As a result, this Court should affirm his convictions.

47

## IV. Woods fails to establish plain error in the district court's steps to ensure the victim understood the possible consequences of giving a false alibi.

### A. *Standard of review*

Woods admits he did not preserve error, so review is limited to plain error. *See Pirani*, 406 F.3d at 549.

### B. *Argument*

Woods had no constitutional right to freely offer perjured testimony. The district court recognized signs that he may induce MV2 to give a false alibi, so it acted within its discretion by taking steps to warn MV2 of the consequences. This action was not clearly or obviously erroneous, and the record forecloses any reasonable probability of a different outcome. Woods fails to prove plain error, so this Court should affirm his convictions.

Woods's witness-badgering challenge begins with a lack of proof. Unlike cases in which the court directly admonished a witness, the district court only addressed MV2's attorney. When MV2's attorney arrived on the second day of trial, the court gave her a quick summary of the evidence as well as sharing Woods's intent "to call [MV2] to ask him where they were on a particular day at a particular time." (Trial Tr.

48

Vol. II, p. 268.) The court expressed concern "that [MV2] may be put in a position of being asked to commit perjury on behalf of this defendant." (Trial Tr. Vol. II, p. 269.) The court added that MV2 "probably has a Fifth Amendment privilege not to testify as the defendant has proposed" and that the prosecutor "could fairly cross-examine him on a whole lot of stuff that would be pretty difficult for him." (*Id.*) MV2's attorney then left the courtroom to confer with MV2 (*Id.*), but the record does not reveal what, if anything, counsel passed along to MV2. And Woods provides no precedent establishing clear or obvious error for a court to provide background information to an attorney who then privately counsels her client.

Even assuming MV2's attorney repeated everything the court said, the warning against perjury did not cross the line. Once again, Woods admits "the district court has discretion to warn a witness about the possibility of incriminating himself." (Br. 41 (citing *United States v. Silverstein*, 732 F.2d 1338 (7th Cir. 1984).) In this "extremely fact specific" inquiry, the Court considers "the manner in which the prosecutor or judge raises the issue, the language of the warnings, and the prosecutor's or judge's basis in the record for believing the witness

49

might lie." *True*, 179 F.3d at 1090 (quoting *Vavages*, 151 F.3d at 1190).
Applying these three factors, Woods falls well short of establishing clear
or obvious error.

First, filtering the warning through counsel softened the impact of
the court's warning. Without a direct admonition from the court to MV2,
there was no "great disparity between the posture of the presiding judge
and that of a witness." *Webb*, 409 U.S. at 98. Instead, MV2 received the
advice about testifying from an advocate appointed to protect his
interests. And there is nothing exceptional about an attorney advising
her client against committing perjury. *See, e.g.*, *Caldwell v. State*, 886
N.W.2d 491, 500-01 (Minn. 2016) ("Courts have not found due process
violations in cases . . . in which the defense witness was independently
represented by counsel." (quotation omitted)).

Second, the district court's innocuous wording pales in comparison
to the cases Woods cites. (Br. 42.) *Webb* involved the trial judge singling
out the defense witness with a threat to "personally see that your case
goes to the grand jury and you will be indicted for perjury," which would
add years "stacked onto what you already got" and "will also be held
against you in the penitentiary when you're up for parole." *Webb*, 409

50

U.S. at 96. And in *United States v. Arthur*, 949 F.2d 211, 214-15, 216 (6th Cir. 1991), the trial court "repeatedly informed [the witness] of his right to remain silent and stated to him that to testify was against his interest," even though the witness was represented by counsel who had already advised him not to testify. Unlike these cases, the district court did not badger MV2 with repeated threats of imprisonment. Giving his attorney background information and identifying general concerns that allowed MV2 to receive informed legal advice is not the same as "effectively driving [him] off the stand." (Br. 42.)

Third, the district court held well founded concerns about Woods suborning perjury. Woods said he wanted to ask MV2 "about the location on [January] 18th . . . when we went downtown." (Trial Tr. Vol. II, p. 268.) This summary resembles the testimony Woods later elicited from his sister, who claimed that she, Woods, their parents, and "the kids" spent January 18, 2021, at the riverfront. (Trial Tr. Vol. II, pp. 279-80.) The jury's guilty verdict reflects that it disbelieved his sister's testimony, and the court expressly held so when finding Woods induced her to give the false alibi. (Sent. Tr. 13.) Indeed, in a jail phone call with Woods after trial, his sister chided, "you did bad things . . . [a]nd you had me lie for

51

you." (R. Doc. 214-1.) The district court's prescient warning to MV2's attorney prevented him from succumbing to Woods's obstructionist pressure. Equally, it was apparent that MV2 "would be subject to difficult cross examination." (Br. 42.) Professing Woods's innocence would have collided with evidence that Woods possessed numerous pornographic images of MV2 and that Woods offered MV2 to another pedophile as "boy butt for ur cock whenever u want." (*See generally* Trial Tr. Vol. I, pp. 118-141; PSR pp. 9-12; ¶ 26; R. Doc. 198, p. 39 (Gov't Ex. 84).)

Additionally, Woods does not prove that the court's warning caused MV2 not to testify. Unlike past cases in which the badgered witness invoked his Fifth Amendment privilege on the record, *e.g.*, *Arthur*, 949 F.2d at 214, Woods's record shows only that he chose not to call MV2 after the court gave Woods time to confer with his sister. (Trial Tr. Vol. II, pp. 273-74.) Woods's lack of objection clouds the undeveloped record with ambiguity. Perhaps MV2 invoked his privilege, or perhaps he expressed that he would not testify consistent with Woods's claimed alibi. Or given Woods's success persuading his sister to give the false alible, perhaps he no longer had he need for MV2's testimony. Speculation about whether the court's warning induced the witness's silence does not satisfy Woods's

52

burden to prove plain error. *See True*, 179 F.3d at 1090 (finding no prejudice when "the record does not support the conclusion that the prosecutor's comments caused [the witness's] silence").

Even if Woods could establish clear or obvious error, the record leaves no reasonable probability of a different result. *See Marin*, 31 F.4th at 1055 ("Under plain error review, a defendant must demonstrate a reasonable probability that the outcome would have been different absent the alleged error." (quotation omitted)). Jurors heard Woods's alternative narrative through his sister's testimony, which they rejected in favor of the overwhelming proof of guilt. Text messages on Woods's phone reflected that he sent MV2 away that morning to spend time with Woods's mother (Trial Tr. Vol. II, pp. 284-87), which undermined any attempt to use MV2 as an alibi witness. And the remaining evidence established that Woods invited pedophiles to abuse the children, that Woods created pornographic images of both, and that Woods photographed while Heider anally penetrated MV1.

Woods does not demonstrate plain error. The record lacks proof that the district court's non-threatening discussion with counsel drove MV2 off the stand. And regardless of the court's perjury warning, the strength

53

of the evidence dictated the result of trial. Woods deserves no relief, so this Court should affirm his convictions.

## V. The absence of any trial error precludes Woods's cumulative error argument.

"[A]s the saying goes, zero plus zero equals zero." *United States v. Powell*, 444 F. App'x 517, 522 (3d Cir. 2011) (unpublished). A claim of cumulative error inherently requires proof of more than one error. *See, e.g.*, *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." (citations omitted)). And Woods does not demonstrate error or prejudice in any of his challenges, so his cumulative error argument fails. *See United States v. Anderson*, 783 F.3d 727, 751 (8th Cir. 2015) ("Because we reject all of Anderson's claimed errors, his cumulative-error argument fails.").

Even if Woods could demonstrate more than one error, his case as a whole does not "present[] an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights." *United States v. Louper-Morris*, 672 F.3d 539, 562 (8th Cir. 2012) (citations omitted). He

54

received a fair trial and was convicted based on the overwhelming evidence establishing his guilt. He does not deserve a new trial.

## VI. Woods fails to demonstrate plain error because he has the ability to pay the criminal assessment by making small payments throughout his lengthy incarceration.

### A. Standard of review

Woods did not object to imposition of the assessment, so he "must establish a plain error that affected his substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Ohlmeier*, 25 F.4th 571, 573 (8th Cir. 2022) (citing *Olano*, 507 U.S. at 732).

### B. Argument

In his final complaint, Woods fails to show plain error in the imposition of a special assessment averaging just $100 per year. The district court correctly recognized that over the course of his lengthy incarceration, he can pay the assessments in small installments from prison wages. Because he does not prove any inability to pay, this Court should affirm.

Woods challenges his ability to pay a special assessment. The Amy, Vicky, and Andy Child Pornography Victim Assistance Act states "the

55

court shall assess . . . not more than $50,000 on any person convicted of a child pornography production offense." 18 U.S.C. § 2259A(a)(3). Money collected under the AVAA funds the Child Pornography Victims Reserve, which provides assistance to exploited child victims. *Id.* § 2259B. The sentencing court is to consider "the defendant's income, earning capacity, and financial resources." *Id.* §§ 2259A(c), 3572(a)(1). At Woods's sentencing hearing, the district court asked if he had any thoughts on the AVAA assessment. (Sent. Tr. 27-28.) Woods did not object to imposition of any assessment; instead, he offered his understanding "that I will be getting a job when I go to jail" and that he "would work it out with the probation office or the prison itself on how much they take out." (Sent. Tr. 28.) The court imposed a $2500 assessment. (Sent. Tr. 28.)

To begin, Woods bears the burden to prove his inability to pay. The AVAA requires the sentencing court "shall" impose an assessment for child pornography offenses. 18 U.S.C. § 2259A(a). With respect to the similarly-worded JVTA assessment[9], this Court has found "a district

---

[9] *See* Justice for Victims of Trafficking Act, 18 U.S.C. § 3014(a) (stating "the court shall assess an amount of $5,000 on any non-indigent person" convicted of certain offenses, including sexual exploitation).

56

court has no choice but to impose the special assessment" on a defendant who has the ability to pay, and "the burden to establish otherwise rests with the defendant." *United States v. Wesley*, 96 F.4th 1045, 1047 (8th Cir. 2024) (citing *United States v. Kelley*, 861 F.3d 790, 800 n.5 (8th Cir. 2017)); *see also United States v. Ball*, No. 23-3461, 2024 WL 3311412, at *1 (8th Cir. July 5, 2024) (unpublished) (recognizing the defendant "bears the burden of proving his indigency" in a case involving both AVAA and JVTA assessments); *cf. United States v. Wright*, 540 F.3d 833, 847 (8th Cir. 2008) ("The defendant has the burden of proving that he cannot pay the fine." (quoting *United States v. Berndt*, 86 F.3d 803, 808 (8th Cir. 1996))). Thus, it was Woods's burden at sentencing to prove his inability to pay, not the government's burden to prove non-indigency.

"[I]ndigency depends on 'a defendant's current financial situation *and* his ability to pay in the future.'" *Wesley*, 96 F.4th at 1047 (emphasis original) (quoting *Kelley*, 861 F.3d at 801). "What matters, in other words, is a defendant's ability to pay, now or later." *Id.* On one extreme, "[a]n appreciable net worth at the time of sentencing generally requires the special assessment, regardless of future earning power." *Id.* (citing *United States v. Mung*, 989 F.3d 639, 645 (8th Cir. 2021)). On the other

57

side, "defendants who have future earning capacity because of their young age, good health, education, skills, or work experience are also eligible for it." *Id.* (quotations omitted).

Woods is wrong to compare his ability to pay the assessment to his ability to pay for counsel. He notes that he "has a court appointed attorney on appeal." (Br. 45.) But this Court has made clear, "An individual may be indigent for purposes of appointing counsel and, at the same time, may be non-indigent for purposes of the JVTA special assessment." *United States v. Rhodes*, 828 F. App'x 342, 343 (8th Cir. 2020) (unpublished) (citing *Kelley*, 861 F.3d at 801). Because Woods's need for court-appointed counsel during his appeal does not equate to a permanent inability to pay the special assessments, he fails to demonstrate plain error.

Next, Woods's current net worth did not necessitate waiving the AVAA assessment. He contends that "[a] negative net worth indicates that someone is indigent." (Br. 45.) The PSR set his net worth at negative $1,854. (PSR p. 32, ¶ 142.) And this Court has found a defendant with "a slightly negative net worth" failed to prove indigency. *Kelley*, 861 F.3d at 802; *compare United States v. Barthman*, 983 F.3d 318, 322-23 (8th Cir.

58

2020) (finding indigency for a defendant whose net worth was negative $166, 903). Because Woods's current financial situation approximates the slightly negative net worth in *Kelley*, the district court did not plainly err by declining to find an inability to pay based on that number alone.

Similarly, Woods shows no plain error concerning his earning capacity while incarcerated. The district court explained that given his 100-year sentence and his life expectancy, "he would have probably a good 25 years of serving time in a prison that he could earn some money towards an assessment." (Sent. Tr. 28.) With that, the $2500 assessment broke down to just $100 per year. (Sent. Tr. 28.) Woods complains that, "[a]ccording to the BOP website, inmates earn between 12 cents and 40 cents per hour at their work assignments." (Br. 46.) But this Court has previously rejected a similar argument. *See Wright*, 540 F.3d at 847 (finding no clear error for imposing a $25,000 fine based on the district court's finding that "[i]n light of the fact that he's sentenced to a life sentence and he'll be eligible for UNICOR and other prison programs, I believe that he does have the ability to pay a fine in that dollar amount").

Woods shows nothing unlawful about requiring child pornographers like him to pay a portion of their prison wages toward the

59

AVAA assessment. This Court recently found a defendant could pay $20,000 in assessments over the course of his forty-year prison sentence, explaining that even these wages [of $4.80 to $16 per week], over time, can make a sizable dent in his financial obligations." *Ball*, 2024 WL 3311412, at *2. Likewise, the Sixth Circuit rejected a plain-error challenge against a JVTA assessment for a defendant who "most likely will spend the rest of his life in prison," where he could expect to earn "from $ .12 to—at most—$ .40 per hour." *United States v. Easterling*, 811 F. App'x 306, 310 (6th Cir. 2020) (unpublished). That court reasoned, "Although those earnings are indisputably meager, they are funds that can be assigned to [the defendant's] financial obligations and support the district court's finding that he will have the ability to work in prison." *Id.* Because Woods can pay many small installments over the course of his lengthy incarceration, the district court did not plainly err by finding he should apply some of his prison earnings toward paying the AVAA assessment.

Woods relies on distinguishable caselaw. He contends "heavy reliance on inmate earnings is improper," citing *United States v. Kidd*, 23 F.4th 781 (8th Cir. 2022). (Br. 46.) In *Kidd*, the defendant was up-to-

60

date on quarterly payments under his BOP-managed payment plan, but the government sought to seize an additional lump sum of $5,500 from his prison account. *Kidd*, 23 F.4th at 783-84. The Court interpreted the relevant restitution statute as allowing execution against only "windfalls or sudden financial injections," not "accumulated prison wages." *Id.* at 786-87. Unlike *Kidd*, the district court did not take accumulated prison wages from Woods. Instead, its judgment recognized that during his period of incarceration he would make payments "through the Federal Bureau of Prisons' Inmate Financial Responsibility Program." (R. Doc. 220, p. 8.) That program allows BOP to develop a financial plan in which Woods can make payments toward his outstanding debts while limiting deductions from his prison wages. *See generally* 28 C.F.R. § 545.11. And expecting Woods to pay $100 per year matches that program's minimum payment of "$25.00 per quarter." [10] *Id.*

---

[10] Woods is backwards in arguing the IFRP allows wage deductions only "after $75 is removed to ensure inmates can use the telephone." (Br. 46.) The rules instruct BOP staff to "*first* subtract from the trust fund account the inmate's minimum payment schedule for UNICOR or non-UNICOR work assignments" and "*then* exclude from its assessment $75.00 a month deposited into the inmate's trust fund account" for telephone access. 28 C.F.R. § 545.11(b) (emphasis added); *see also Scott v. Wilson*, No. 3:16CV804, 2018 WL 1144586, at *6 (E.D. Va. Mar. 2,

61

§ 545.11(b)(1). Ordering Woods to pay the minimum amount was not plain error.

Woods fails to meet his burden of proving plain error. He will have ample time during his lengthy incarceration to make payments toward the AVAA assessment. None of his many complaints required a finding of indigency under plainly established law, so this Court should not interfere with imposition of the $2500 assessment.

---

2018) (explaining BOP staff "shall <u>first</u> deduct the inmate's IFRP payments before applying the $75.00 per month exemption"); *Driggers v. Cruz*, No. 3:11-CV-2310-D-BK, 2012 WL 2510847, at *2 (N.D. Tex. June 1, 2012) (stating the rule "specifically provides for a $25 minimum quarterly payment *before* the $75 monthly exemption is applied in determining whether a higher IFRP payment is due"), *aff'd*, 740 F.3d 333 (5th Cir. 2014).

Appellate Case: 24-1102    Page: 70    Date Filed: 07/31/2024    Entry ID: 5419285

## CONCLUSION

Woods's convictions and sentences should be affirmed.

Respectfully submitted,

Richard D. Westphal
United States Attorney


By: ___*/s/ Kyle P. Hanson*___
Kyle P. Hanson
Assistant United States Attorney

Neal Smith Federal Building
210 Walnut Street, Suite 455
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292

63

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 12,871 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft 365 Word in Century Schoolbook font, 14 point.

Dated: July 30, 2024.

By: */s/ Kyle P. Hanson*
Kyle P. Hanson
Assistant United States Attorney

Neal Smith Federal Building
210 Walnut Street, Suite 455
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292

## CERTIFICATE OF SUBMISSION AND VIRUS SCAN

I hereby certify that on this 30th day of July 2024, I electronically submitted the BRIEF OF APPELLEE with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system after scanning it for viruses by using the McAfee Endpoint Security scan software program, which reported no viruses were found. Paper copies will be transmitted upon receipt of the Notice of Filing from the Clerk of Court.

*/s/ Dawn Thomas*
Paralegal Specialist

Appellate Case: 24-1102    Page: 73    Date Filed: 07/31/2024 Entry ID: 5419285

## CERTIFICATE OF SERVICE

I hereby certify that I did on this        day of July 2024, mail a true

and correct copy of the foregoing BRIEF OF APPELLEE by placing it in

the U. S. mail, postage prepaid and addressed to the following:

Heather Quick
Federal Public Defender's Office
222 Third Avenue SE, Ste. 290
Cedar Rapids, IA 52401

_____
Name
Title

U. S. Attorney's Office
Neal Smith Federal Building
210 Walnut Street, Suite 455
Des Moines, Iowa 50309
Tele: (515) 473-9300
Fax:  (515) 473-9292